# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### CHIEF JUDGE MARCIA S. KRIEGER

Criminal Action No. 17-cr-00152-MSK-GPG

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FELICIA BETH BEIDER,

      Defendant.

_____

## OPINION AND ORDER SUSTAINING OBJECTIONS AND GRANTING MOTION TO SUPPRESS
_____

**THIS MATTER** comes before the Court pursuant to Ms. Beider's Objection **(# 79)** to the Magistrate Judge's Recommendation **(# 69)** that Ms. Beider's Motion to Suppress **(# 22)** be denied, and the Government's response **(# 80)**.[1]

## FACTS

Ms. Beider is charged in a one-count Indictment **(# 1)** with possession of controlled substances with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii).

Ms. Beider was apprehended following a traffic stop and canine search that revealed Ms. Beider's vehicle to contain 15 bricks of cocaine. In this action, she moves **(# 22)** to suppress the

---

[1] After filing her Objections, Ms. Beider filed a Notice of Disposition **(# 81)**. This Court construed that notice as indicating that Ms. Beider wish to plead guilty to some or all charges and no longer wished to pursue her Objections. However, the Court is informed that on February 4, 2019, the parties appeared before Magistrate Judge Gallagher for a change of plea hearing and informed Judge Gallagher that Ms. Beider intends to enter a <u>conditional</u> plea, preserving her right to appeal any final determination by this Court that may deny her Motion to Suppress, and that therefore, she continues to press her Objection.

fruits of that stop and search. Specifically, Ms. Beider contends that the officer who initiated the stop, Colorado State Trooper Shane Gosnell: (i) lacked reasonable suspicion to believe that Ms. Beider had committed a traffic infraction; (ii) unreasonably prolonged her detention by summoning a canine unit without having reasonable suspicion to do so, and (iii) conducted a warrantless search based on an alleged canine alert when there was no evidence of an alert. The Court referred Ms. Beider's motion to the Magistrate Judge to conduct an evidentiary suppression hearing and issue a recommendation. The Magistrate Judge conducted the hearing over two days, August 1 and September 4, 2018, and the end of the second day, issued an oral recommendation that Ms. Beider's motion be denied. Ms. Beider filed timely Objections **(# 79)** to the Magistrate Judge's recommendation, and the matter is now ripe for determination by this Court.

## ANALYSIS

### A. Standard of review

The Magistrate Judge's Recommendation was issued pursuant to 28 U.S.C. §636(b)(1)(B). Under that statute, this Court makes a "*de novo* determination of those portions of the . . . recommendations to which objection is made." Notably, the requirement is that this Court conduct a *de novo* <u>determination</u>, not necessarily a *de novo* <u>hearing</u>. The Court is possessed of wide discretion to accept, reject, or modify the Magistrate Judge's proposed findings, including resolving issues of credibility. *U.S. v. Raddatz,* 447 U.S. 667, 676 (1980).

### B. Initial stop

A traffic stop is a seizure under the Fourth Amendment, and thus the officer initiating it must have reasonable suspicion that "this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *U.S. v. Salas*, 756 F.3d 1196,

1200-01 (10th Cir. 2014). Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances; the officer's subjective motivation for the stop is irrelevant. *Id.* at 1201. The Government bears the burden of proving the reasonableness of the officer's suspicion at all pertinent stages of the encounter. *U.S. v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018).

The evidence at the hearing revealed the following. On September 16, 2016, Trooper Gosnell was parked in his patrol vehicle on I-70 near Grand Junction, Colorado, observing eastbound traffic. At approximately 3:30 p.m., he observed an approaching group of vehicles that included a silver Volvo SUV. As the Volvo passed Trooper Gosnell's location, he observed the driver "lean back out of view." Believing the driver's behavior to be unusual, noticing that the vehicle had a yellow license plate (which Trooper Gosnell believed to be from New York), and knowing that this particular model of Volvo SUV has a "natural void" in its floor design that makes such vehicles particularly attractive vehicles to drug traffickers, Trooper Gosnell decided to pull out and follow the vehicle.

Trooper Gosnell observed the Volvo, which was traveling in the left lane of the highway, make "an abrupt lane change" into the right lane in front of a red sedan. Believing that the Volvo had "approximately a car length or less" of space in front of the red sedan when it changed lanes, Trooper Gosnell concluded that the driver of the Volvo had violated a Colorado traffic law. After allowing nearby traffic to clear, Trooper Gosnell pulled alongside the Volvo to "look for secondary violations," such as unfastened seat belts. He observed that the driver "was still leaning back out of view." At that point in time, he activated his emergency lights and signaled the Volvo to pull over to the side of the highway.

Before proceeding with analysis Trooper Gosnell's stop, the Court pauses to address the testimony of David Dolan, proffered by Ms. Beider under Fed. R. Evid. 702. Mr. Dolan testified that he had previously been employed for many years in law enforcement, but his current relevant experience was in traffic investigation and accident reconstruction. Mr. Dolan testified that he reviewed, among other things, Trooper Gosnell's written report about the traffic stop as well as the video recorded by Trooper Gosnell's dashboard camera. Mr. Dolan disagreed that the driver of the Volvo was leaning back and hidden from view when passing in front of Trooper Gosnell's car, and identified certain still frames from the dashcam video that, he opined, showed the driver sitting upright. Mr. Dolan also disagreed that the Volvo changed lanes too closely in front of the red sedan. Based on observing road markings seen in the video, Mr. Dolan opined that there was approximately 40 feet between the Volvo and the red sedan when the Volvo moved into the right lane, and that the lane change was not unsafe.

With those facts in mind, the Court turns to the question of whether Trooper Gosnell had reasonable suspicion to effect a stop of the Volvo. There is a bit of ambiguity as to the appropriate Colorado traffic statute implicated at this stage of the analysis. Trooper Gosnell did not specify any particular Colorado statute he believed was violated by the Volvo's driver, other than to characterize the driver as having made an "unsafe lane change." Ms. Beider's counsel, when cross-examining Trooper Gosnell, first raised the suggestion that C.R.S. § 42-4-1007 was "the lane change stated the trooper claims that the silver Volvo violated." In pertinent part, C.R.S. § 42-4-1007(1)(a) provides that, on any road divided into multiple traffic lanes, "a vehicle . . . shall not be moved from [its] lane until the driver has first ascertained that such movement can be made with safety." In giving his oral Recommendation, the Magistrate Judge concluded that two statutes were implicated: C.R.S. §. 42-4-1007(1)(a), and also C.R.S. § 42-4-1008(1),

4

which provides that a driver "shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." (The Magistrate Judge reasoned that the latter statute applied because the Volvo's driver arguably "put another vehicle in the position where it was following too closely due to [the Volvo driver's] own actions.") It appears to this Court that the more applicable statute is C.R.S. § 42-4-1003(1)(a), which provides that "the driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left . . . and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle." Ultimately, however, the distinction between the statutes is not particularly important. Whether the Court applies C.R.S. § 42-4-1007's prohibition on changing lanes unless one can do so "with safety" or C.R.S. § 42-4-1003's requirement that a vehicle not return to the driving lane until "safely clear," the applicable standard is some variant of the word "safe."

Colorado law does not reduce that statutorily-adopted requirement of "safe" lane changes to any precise measurements or criteria, leaving a law enforcement officer some degree of discretion in deciding whether a driver has violated the statute. Trooper Gosnell testified that he considers several factors in deciding whether a driver's lane change was unsafe, including "speed limits, perception reaction time, [and] stopping distance." He also considers "a recommendation by the Colorado Driver's Handbook that [cars maintain] a minimum of three seconds" between them. A car traveling at 75 m.p.h. – the speed limit applicable to this portion of the highway and roughly the speed that the Volvo and red sedan were traveling-- would travel 330 feet in three seconds. Even adopting Mr. Dolan's estimate of 40 feet of space between the Volvo and the red sedan, at 75 m.p.h,, the red sedan would close that distance in roughly one-third of one second. These figures suggest that the dispositive issue is not whether the Volvo's driver left the red

sedan "one car length" or about 15 feet (as Trooper Gosnell contends) or 30-40 feet (as Mr. Dolan opines), or even whether 330 feet of space was required.  The pertinent question is not even whether the Volvo's driver could have safely changed lanes in the space available, as the reasonable suspicion standard does not require Trooper Gosnell "to rule out the possibility of innocent conduct."  *U.S. v. Vance*, 893 F.3d 763, 774 (10th Cir. 2018).   The "reasonable suspicion" standard, which requires evidence "considerably short of a preponderance," merely requires Trooper Gosnell to articulate a particularized, objectively-reasonable basis for believing that the Volvo's driver changed lanes unsafely.  Even assuming the Volvo left the red sedan the 40 foot gap suggested by Mr. Dolan, at highway speeds, the red sedan's driver would have had only a fraction of a second to respond to a sudden emergency, such as loose cargo falling out of the Volvo or the Volvo's driver engaging in emergency braking.  In such circumstances, he Court cannot say that Trooper Gosnell's belief that the Volvo's lane change presented an undue safety risk was somehow unreasonable.  Accordingly, the Court finds that Trooper Gosnell's decision to stop the Volvo was supported by reasonable suspicion.

### C.  Contact with driver

After pulling the vehicle over, Trooper Gosnell exited his car and approached the passenger side of the Volvo.   At this time, the Volvo's windows were up and a stiff wind was blowing, but Trooper Gosnell testified that he detected an "overwhelming odor of air freshener." As he approached the Volvo, he observed a medium-sized suitcase in the back seat.  The sole occupant of the Volvo – the driver -- had her license and registration ready and promptly handed them to Trooper Gosnell.  Trooper Gosnell observed that the driver's (now identified to be Ms. Beider) hands were shaking, which he attributed to be due to nervousness, but he did not testify that her degree of nervousness was unusual.  Trooper Gosnell asked Ms. Beider about her travel

plans, and she responded that she was returning to her home in New York after having visited her daughter in Los Angeles for approximately a week, and that she was "just enjoying the scenery on her way back." Trooper Gosnell described Ms. Beider's manner of speech as being "exaggerated or very animated in her responses." Trooper Gosnell also observed "at least three air fresheners. They were hanging on the shifter down on, like, the center console and then there were some on the passenger's side floorboard." Trooper Gosnell testified that "they weren't like the little tree air fresheners. They were large, black in color." He believed them to be new, as they were not faded by the sun and he again repeated that their scent was "overwhelming." The record contains only one photograph of the inside of Ms. Beider's car, taken while a physical search was underway; that photograph shows a single, black, pine tree-shaped air freshener tied to the gearshift lever on the center console.

Trooper Gosnell then checked the VIN and registration sticker of Ms. Beider's vehicle and informed her that he was going to check her documents and, likely, would issue her a warning. He then returned to his patrol car. Once there, he radioed Trooper Anderson, the canine unit officer, and asked him to come Trooper Gosnell's location. As can be heard on the video recording, Trooper Gosnell stated

> Overwhelming odor of air freshener. Short trip – she was in Los Angeles for a week visiting a daughter, supposedly. I didn't see much for luggage. . . Hey man, this might be one that I need an opinion on. Female, said she was out visiting her daughter in Los Angeles. She seems nervous to me. There's an overwhelming odor of air freshener in the car. And then, uh, just like... she said she was out there a week. It just doesn't make sense to me as to why she would drive and not fly. Some of those kinds of things. . . . And these vehicles are just good for floor stuff, you know.

At the hearing, Trooper Gosnell gave at least two explanations for his decision to call Trooper Anderson. First, he testified that he "those were indications of the criminal activity I

was seeing." He then testified that "it's common to contact a cover officer for safety, and then while I conduct my business, that officer can engage the driver in conversation to articulate either that there is suspicion there or no, it's not." Only after calling Trooper Anderson did Trooper Gosnell begin checking of Ms. Beider's license and other information.

Because Trooper Gosnell's call to Trooper Anderson is a significant chapter in the story, the Court pauses at this point to analyze the situation as it then-existed. In *Rodriguez v. U.S.*, 135 S.Ct. 1609, 1614 (2015), the Supreme Court explained that "[b]ecause addressing the [traffic] infraction is the purpose of [a] stop, it may last no longer than is necessary to effectuate that purpose." Thus, a police officer's authority to seize a driver "ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." Those tasks may include "determining whether to issue a traffic ticket, . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." But the stop may not be prolonged for the purpose of "detecting evidence of ordinary criminal wrongdoing" unless separate reasonable suspicion exists to support an additional delay. Even "*de minimis*" delays unrelated to the traffic violation trigger additional Fourth Amendment scrutiny. Thus, the Court's inquiry is whether the decision to turn attention to criminal, rather than traffic, investigation "prolongs – *i.e.* adds time to – the stop." *Id.* at 1614-1616.

Here, Trooper Gosnell's decision to call in Trooper Anderson for an "opinion" was unambiguously a request to have Trooper Anderson opine as to whether Ms. Beider was engaged in drug trafficking, not an opinion as to whether she had committed the traffic infraction of changing lanes unsafely. Although the Government elicited some general testimony from Trooper Gosnell about calling for backup when safety concerns are present, Trooper Gosnell did

not testify at the hearing that his decision to call Trooper Anderson in this situation was in any way premised upon officer safety concerns. Indeed, Trooper Gosnell's safety-related explanation for calling for backup was itself based on having a second officer present to "engage the driver in conversation to articulate either that there is suspicion" –the "suspicion" here being a suspicion of drug trafficking, not a traffic violation. Moreover, nothing in the recording of Trooper Gosnell's statements to Trooper Anderson suggests that Trooper Gosnell was requesting Trooper Anderson for safety purposes. To the contrary, Trooper Gosnell was clear that his intention in calling for Trooper Anderson was to further an investigation into possible criminal activity. Thus, the Court need not reach the question of whether a decision by Trooper Gosnell to call for backup for safety reasons would warrant a different analysis herein.

Because the call to Trooper Anderson was unrelated to traffic enforcement purposes, the next question is whether it "prolonged" the stop. Trooper Gosnell's discussion with Trooper Anderson took approximately 1 minute and 10 seconds. Although this is not an extended period of time, it is more than a *de minimis* delay that *Rodriguez* recognizes as raising constitutional concerns.

Of course, it is possible that the call to Trooper Anderson did not actually prolong the stop of Ms. Beider. Here, the precise sequence of actions that Trooper Gosnell undertook become important. If, for example, Trooper Gosnell promptly began conducting the tasks described by *Rodriguez* as permissible aspects of traffic enforcement – *e.g.* checking the driver's license and registration, checking for outstanding warrants – and only contacted Trooper Anderson during an otherwise idle period while Trooper Gosnell awaited reports back from a dispatcher or database, it would be fair to say that the call to Trooper Anderson did not prolong Ms. Beider's stop at all. Alternatively, it may be that Trooper Gosnell excels at multi-tasking,

and can efficiently conduct the traffic enforcement checks from his patrol car's computer while simultaneously talking to Trooper Anderson on the phone. In such circumstances, the call to Trooper Anderson might not have added any time to the stop of Ms. Beider than would otherwise have occurred. But if Trooper Gosnell diverted his attention away from conducting the traffic records checks in order to call Trooper Anderson, the stop would be prolonged by the duration of that call.

The Court has done its best to attempt to ascertain, from the testimony and video, the sequence in which Trooper Gosnell acted. The inquiry is complicated by the fact that most of Trooper Gosnell's records checks were conducted using his in-vehicle computer, and thus, the dash cam recording of the incident sheds little light on the sequence in which Trooper Gosnell acted. Trooper Gosnell's testimony on this point was not sufficiently granular to allow the Court to ascertain the precise sequence of events either. Thus, the Court is left primarily with Trooper Gosnell's affirmative response to a question posed by the Government that suggests that the call to Trooper Anderson came before Trooper Gosnell began any records checks:

> Q: <u>While waiting for Trooper Anderson to get there</u>, did you <u>begin</u> running checks on the defendant and her vehicle?
>
> A: Yes, I did. . . ." (Emphasis added.)

Thus, the transcript of the hearing indicates that the call Trooper Anderson was completed <u>before</u> Trooper Gosnell began performing the steps attendant to completing the traffic stop. The call therefore prolonged that stop in order to involve Trooper Anderson in the determination of whether there was probable cause to believe that Ms. Beider was transporting drugs. This purpose was unrelated to traffic enforcement. Accordingly, because Trooper Gosnell prolonged Ms. Beider's detention for criminal investigation purposes, the Court turns to the question of whether Trooper Gosnell possessed reasonable suspicion of criminal activity in order to do so.

In his recorded comments to Trooper Anderson, Trooper Gosnell recited most of the indicia of criminal activity that the Government relies upon here: (i) the "overwhelming odor of air freshener"; (ii) the fact that Ms. Beider described making only a "short trip" – presumably meaning "only a week long" -- from New York to Los Angeles by driving rather than flying; (iii) that Ms. Beider "seems nervous"; and (iv) that the Volvo she was driving is a type of vehicle known for being useful for transporting drugs. Although he did not articulate it to Trooper Anderson, Trooper Gosnell's testimony at the hearing also suggests that Ms. Beider's "exaggerated or very animated" responses also contributed to his suspicion.[2]

The Court begins by quickly winnowing out several of these explanations. The 10th Circuit has consistently held that "only extreme nervousness can substantially contribute to reasonable suspicion"; ordinarily-observed levels of nervousness do not add meaningfully to the analysis. *U.S. v. Lopez*, 849 F.3d 921, 925-26 (10th Cir. 2017) (emphasis in original). At no point did Trooper Gosnell testify that he considered Ms. Beider to demonstrate atypical levels of nervousness; indeed, he conceded that "it's not atypical" for a pulled-over driver to demonstrate some degree of nervousness. Thus, this factor is afforded no meaningful weight. Similarly, the Court rejects the suggestion that Ms. Beider's stated travel plans -- that she drove from New York to Los Angeles and back in order to have a weeklong visit with her daughter – is particularly implausible.[3] *See generally Lopez*, 849 F.3d at 927 (collecting cases and suggesting

---

[2] The Court does not understand Trooper Gosnell to contend that his belief that Ms. Beider was "leaning back" and trying not to be seen as she passed his parked vehicle also contributed to his suspicion. Trooper Gosnell testified that it driver's "leaning back out of view" is something that happens with some frequency and that "it comes down to nervous behavior." Thus, consideration of this fact is subsumed within the Court's discussion of the "nervousness" factor herein.

[3] As discussed below, Trooper Gosnell later acquired additional information that shed light on Ms. Beider's claimed travel plans, but that information was not in his possession at the time

that, when travel plans have been found to contribute to reasonable suspicion "it has been

because it begged credulity to think that the purported purpose of the trip could justify the travel

plans"), *quoting U.S. v. Wood*, 106 F.3d 942, 944 (10th Cir. 1997) ("there is nothing criminal

about traveling by car to view scenery").  Trooper Gosnell had already observed a "medium"-

sized suitcase in the car, lending further support to the plausibility of Ms. Beider's stated travel

plans.  *Compare U.S. v. Guerrero-Sanchez*, 412 Fed.Appx. 133, 139 (10th Cir. 2011) (driver's

lack of luggage was inconsistent with stated plans of 4-5 day long vacation).  Accordingly, the

Court affords neither Ms. Beider's nervousness or stated travel plans any significant weight in

determining whether Trooper Gosnell had reasonable suspicion to prolong the stop.

 The Court also discounts Trooper Gosnell's observation that Ms. Beider was

"exaggerated or very animated" in her responses to him.   Trooper Gosnell did not elaborate on

what behavior or statements supported this observation and he acknowledged that he had no

familiarity with Ms. Beider that enabled him to conclude that this was not simply how she

typically expressed herself.  Indeed, although this fact is revealed later in the chronology, it is

worth noting here that Trooper Anderson, after speaking with Ms. Beider, disputed that Ms.

Beider's manner was particularly unusual.  Trooper Anderson told Trooper Gosnell that, to him,

Ms. Beider's demeanor "was pretty normal for a New Yorker, somebody from Long Island like

that."   Moreover, although only a small portion of Ms. Beider's statements can be heard on the

video recording of the stop, nothing in those statements appears to be so outside the range of

normal human expression as to suggest that Ms. Beider's behavior was patently suspicious.  As

the 10th Circuit in *Lopez* explained, evidence of ordinary levels of nervousness are not given

---

he decided to call Trooper Anderson, and is thus not properly before the Court at this point in the
analysis.

weight in the reasonable suspicion analysis because "its measure is so subjective and innocent people can vary widely in how they respond to an encounter with police." 849 F.3d at 925. That same reasoning would apply to the subjective observation that a driver was "exaggerated or animated." Thus, the Court affords this observation little evidentiary value as well.

That leaves two observations: the "overwhelming smell of air freshener" and the fact that Ms. Beider's vehicle was a type favored by drug traffickers. The 10th Circuit "has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis," as air fresheners are sometimes used by drug traffickers in the hopes of concealing the scent of narcotics from canine searches. *U.S. v. West*, 219 F.3d 1171, 1178-79 (10th Cir. 2000). But this Court is aware of no case in which the odor of air freshener was the sole or even dominant justification for extending a traffic stop. *See e.g. U.S. v. Bravo*, 306 Fed.Appx. 436, 441-42 & n. 4 (10th Cir. 2009) (circumstances justifying search included overwhelming odor of air freshener, travel plans inconsistent with visible baggage, contradictory answers to questions given by the vehicle's two occupants, extreme nervousness, and the officer's knowledge of the driver's prior drug history, with the contradictory answers being the most prominent factor); *U.S. v. Lopez-Guiterrez*, 334 Fed.Appx. 880, 883 (10th Cir. 2009) (search justified by multiple signs of hidden compartments in vehicle, an air freshener and a rose seemingly intended to mask the smell of narcotics, more cell phones in the car than passengers, multiple images of religious icons associated with drug traffickers, and less luggage than would be expected given the driver's travel plans, with the compartments being the most significant factor).

As to the fact that the Volvo XC90 was a model of vehicle popular with drug traffickers, the Court cannot conclude that this factor alone (or even in conjunction with the minimal additional evidence of the odor of air freshener), amounts to a reasonable suspicion that would

permit Trooper Gosnell to extend his detention of Ms. Beider. To hold otherwise would suggest that any police officer anywhere in the United States would have reasonable suspicion to stop and search any Volvo XC90 they saw, regardless of other circumstances, simply because a small number of those vehicles are used by drug traffickers. The Fourth Amendment is not so easily compromised. At most, the model of the vehicle Ms. Beider was driving and the scent of air freshener each provide a relatively small amount of weight to the reasonable suspicion calculus. The reasonable suspicion standard "is not, and is not meant to be, an onerous [one]." *U.S. v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015). Nevertheless, the Court finds that yet even combined, the factors identified by Trooper Gosnell are insufficient to constitute reasonable suspicion of criminal activity that would allow Trooper Gosnell to prolong Ms. Beider's detention.

Accordingly, the Court finds that Trooper Gosnell's pause to summon Trooper Anderson was an action unrelated to the traffic stop that prolonged Ms. Beider's detention without reasonable suspicion, in violation of her Fourth Amendment rights. To determine whether the discovery of the controlled substances in Ms. Beider's vehicle flowed from this violation, the Court must proceed to the next step in the chronology.

### D. Record checks

Trooper Gosnell described two separate checks that he conducted simultaneously from his patrol car. He used the computer in his vehicle to check "driver and vehicle information" about Ms. Beider, which the Court assumes refer to the sort of inquiries – into driver's license and vehicle registration databases, as well as to check the National Criminal Information Center's ("NCIC") database regarding outstanding warrants – that are ordinary incidents of any traffic stop. Trooper Gosnell testified that, "at the same time" he was using his cell phone to

contact the El Paso Intelligence Center ("EPIC"). EPIC is a "dispatch center for federal agencies" that has access to records maintained by numerous federal agencies, including Homeland Security, the Drug Enforcement Administration, Customs and Border Protection, and others. EPIC can "check federal databases for criminal active cases or past cases," as well as "a lot of other things [like] license plate readers." Trooper Gosnell's side of the conversation with an EPIC representative can be heard on the dash cam audio, but the representative's responses are not audible.

Trooper Gosnell testified that although Ms. Beider's driver's license, vehicle registration, and NCIC check came back clean, the EPIC representative advised him that Ms. Beider "had some past charges of larceny and narcotics." At the hearing, Trooper Gosnell could not recall how old those charges were, but he did recall that "they weren't current. . . they were from a while previous." The EPIC representative also informed Trooper Gosnell that license plate readers along Interstate 40 in Arizona had recorded the same vehicle Ms. Beider was driving traveling westbound at three separate times on September 14, two days earlier. Trooper Gosnell also used his vehicle computer to access records from local license plate readers maintained by the Mesa County Sheriff's Office. Those records revealed that Ms. Beider's vehicle was recorded driving along Interstate 70 in Mesa County, Colorado in both May and June of 2016.

Once again, the Court pauses at this stage in the chronology. As noted above, Trooper Gosnell's records checks relating to Ms. Beider's driver's license and vehicle registration (and presumably a warrant check via NCIC) were a necessary and proper component of the traffic stop. But Trooper Gosnell's contact with EPIC or his query of local license plate readers are not – again, the information he obtained from these sources sheds no light whatsoever on the question of whether Ms. Beider made an unsafe lane change or whether her driver's license and

registration were in order.[4]  Once Trooper Gosnell had completed the checks relating to the

traffic stop, all that remained in order to conclude the traffic stop was to complete any written

warning or ticket, return Ms. Beider's documents, and send her on her way.  Thus, to the extent

that Trooper Gosnell's contact with EPIC or his review of local license plate readers began or

continued after he had completed his check of Ms. Beider's license and registration, the

discussion with EPIC or check of the local license plate readers would be a further prolonging of

Ms. Beider's detention that, again, would require sufficient reasonable suspicion.

      Once again, there is some lack of granularity in the chronology, making it difficult for the

Court to assess the precise sequence in which Trooper Gosnell proceeded and when he acquired

certain items of information relative to acquiring others.[5]  Again, because the Government bears

---

[4]      Arguably, Trooper Gosnell's request from EPIC of Ms. Beider's criminal history might
have been a permissible component of a traffic stop if it pertained to concerns of officer safety.
*See U.S. v. Cone*, 868 F.3d 1150, 1153-54 (10th Cir. 2017).  But the fact that EPIC only informed
Trooper Gosnell of the fact that Ms. Beider had a "narcotics" conviction "contributes little to the
reasonable suspicion inquiry" where "there was no specificity with respect to the nature of these
drug charges and no indication of how old they might be."  *U.S. v. Archuleta*, 619 Fed.Appx.
683, 690 (10th Cir. 2015).
      The same cannot be said of the queries of the license plate readers, however, and the
Court's subsequent analysis focuses primarily on those queries.

[5]      The Court's own assessment of the dash cam recording is as follows.  After taking Ms.
Beider's documents, Trooper Gosnell returns to his vehicle at 15:36:34.  Aside from seemingly-
unrelated radio chatter, no sound occurs until 15:36:50, when the sounds associated with
typing/text messaging can be heard for 3-4 seconds.  At 15:336:58, Trooper Gosnell speaks to an
unknown listener, stating "overwhelming odor of air freshener.. short trip, she was in Los
Angeles for a week visiting a daughter supposedly.  I didn't see much for luggage." At 15:37:20,
there may be a few more seconds of additional typing or texting, but it is difficult to say.  At
15:37:26, Trooper Gosnell begins his radio call to Trooper Anderson, and finishes that call at
approximately 15:38:40.  Sounds of paper shuffling can be heard at 15:39:05 and continue for
about five seconds.  At 15:38:14, Trooper Gosnell can be heard talking on the phone, apparently
with the EPIC representative.  He informs the representative on the results of a previous,
unrelated traffic stop until 15:39:42, at which point he requests information relating to Ms.
Beider.  He is put on hold for about 30 seconds – it is unclear whether additional sounds of
typing can be heard here – and at 15:40:25, he begins providing the representative with
information about Ms. Beider.  At approximately 15:40:57, while Trooper Gosnell is still talking
to the representative, Trooper Anderson arrives on the scene.  Trooper Gosnell has simultaneous

the burden of proving that Trooper Gosnell acted diligently and expeditiously as required by

*Rodriguez*, the lack of sufficient evidence in the record showing that the check of the license

plate readers did not delay the completion of the traffic stop components requires findings in Ms.

Beider's favor.  Thus, the Court will conclude that Trooper Gosnell's check of records through

EPIC and the local license plate readers diverted his attention from completing the components

of the traffic stop, further prolonging Ms. Beider's detention without reasonable suspicion.[6]

---

discussions with the representative and Trooper Anderson until 15:41:51, at which time Trooper Anderson approaches Ms. Beider's car.  Trooper Gosnell continues providing information to the representative.  At 15:42:18, an electronic device in the car plays chimes typically associated with new messages or alerts; a different chime-like alert plays at 15:42:44.  At 15:43:56, in response to an unknown stimuli, Trooper Gosnell announces, to no one in particular, "Yeah, she's up to no good."  It is difficult to assess precisely, but it appears that the representative begins returning information to Trooper Gosnell around 15:44:15.  He listens, periodically saying "okay" and shuffling papers, until completing the call with the representative at 15:48:50. At that same time, Trooper Anderson also returns from talking to Ms. Beider.  They discuss "LPR" – license plate reader reports – both local and national, Ms. Beider's criminal history, and what she had told Trooper Anderson, and then begin discussing how they intend to proceed from here.

       Trooper Gosnell testified that his check of EPIC occurred "at the same time" that he was using his computer to check Ms. Beider's license and registration.  This presents a fascinating legal question that *Rodriguez* hints at but does not consider: whether an officer splitting his attention between permissible records checks relating to the traffic stop and, simultaneously, conducting impermissible checks relating to potential criminal activity is being "reasonably diligent" and "complet[ing the] traffic-based inquiries expeditiously" without prolonging the detention.  135 S.Ct. at 1616.   But this Court need not address that question under the facts presented here.

[6]      Admittedly, one piece of information that Trooper Gosnell received from EPIC added to the reasonable suspicion inquiry: the fact that Ms. Beider's vehicle was seen traveling westbound in Arizona two days earlier, during a time period in which Ms. Beider was allegedly visiting her daughter in Los Angeles or returning home (eastbound) from having done so.  Whether the apparent inconsistency between her stated travel plans and the Arizona evidence, coupled with the odor of air freshener and the make of Ms. Beider's vehicle, gave Trooper Gosnell reasonable suspicion to conduct a further inquiry into possible criminal conduct is an interesting one.  The Court can conceive of a situation in which Trooper Gosnell's acquiring that information suffices to justify the continued detention of Ms. Beider thereafter and the ultimate canine search of the vehicle.

      But even so, the essential question is whether Trooper Gosnell diverted any of his time or attention away from the diligent completion of the traffic stop in order to obtain the EPIC information in the first place.  It would seem unlikely that every moment of the roughly 10

## E. Trooper Anderson's arrival and the vehicle search

Trooper Anderson arrived on the scene while Trooper Gosnell was still in his own vehicle, conducting the checks discussed above. Trooper Anderson approached Trooper Gosnell, who was still on the telephone with EPIC. They had a brief discussion about Ms. Beider and the observations that Trooper Gosnell had made, and then Trooper Anderson approached Ms. Beider's vehicle. Trooper Anderson testified that he also observed an overwhelming odor of air freshener in Ms. Beider's vehicle, as well as a "faint odor of marijuana." Trooper Anderson asked Ms. Beider about her travel plans, and she repeated much of the same information she had already given Trooper Gosnell. Trooper Anderson asked whether this was her first trip to see her daughter in Los Angeles, and Ms. Beider said it was, and she also stated that she refused to fly anywhere "since 9-11." They had further discussions about Ms. Beider's daughter and Ms. Beider's profession (she stated that she sold toys online). At that point, Trooper Anderson returned to Trooper Gosnell's vehicle, and Trooper Gosnell updated Trooper Anderson on the information he had learned from EPIC regarding the Arizona license plate readers. Trooper Gosnell asked Trooper Anderson to return to Ms. Beider's vehicle and to ask her if the had any contraband in her car. Trooper Anderson did so, but before he could ask the question, Ms. Beider pulled out a computer tablet to show him some information about her business. They discussed her travel plans again (with Ms. Beider becoming "short" and stating that she was telling him her plans "for the third time"), and then Trooper Anderson asked her, sequentially, about whether various items of contraband were in her vehicle. She answered no to each (although Trooper Anderson sensed that Ms. Beider "moved her body back

_____

minutes that Trooper Gosnell spent talking to EPIC was during a time when Trooper Gosnell would otherwise have been idle while completing the traffic stop. And in any event, as stated above, the absence of evidence in the record on this point redounds against the Government.

18

and moved her head back and expressed a different tone of 'no'" with regard to his question about whether she had methamphetamine in the car. No methamphetamine was ever found in the vehicle.).

Trooper Anderson returned to Trooper Gosnell, who, "was in the process of finishing up his traffic contact." Trooper Anderson updated Trooper Gosnell on his most recent discussion with Ms. Beider, and Trooper Gosnell informed Trooper Anderson that he intended to ask Ms. Beider for consent to search her vehicle; if she refused, he intended to have Trooper Anderson deploy his canine unit instead. Trooper Gosnell returned to Ms. Beider's vehicle, returned her documents, and delivered a written warning for the traffic infraction. She asked if the warning would result in points on her license, and Trooper Gosnell responded that it would not. He then told her that she was free to go. He "took a couple steps away from the vehicle" (the video shows him walking past the back end of the Volvo before turning around) and then "reengaged her and asked Ms. Beider if she would mind if I asked her some questions." He asked for consent to search the vehicle and Ms. Beider refused. Trooper Gosnell told her that he intended to have Trooper Anderson's canine unit sniff the vehicle and he ordered Ms. Beider out of the car. Trooper Anderson conducted a canine search of the vehicle and stated that the dog alerted. The officers then physically searched the interior of the car and located the drugs in question.

The only factual matter that needs to be addressed at this point in the chronology is Trooper Anderson's testimony that, after twice conversing with Ms. Beider, he returned to the vehicle where Trooper Gosnell "was in the process of finishing up his traffic contact" (which the Court understands to mean that Trooper Gosnell was still completing the written warning). Yet again, it is necessary to disentangle the steps that Trooper Gosnell undertook in order to complete the traffic stop – checking Ms. Beider's records, writing the warning, and delivering it

to her – from the steps that Trooper Gosnell took to investigate his suspicion of criminal drug activity. If, as *Rodriguez* requires, Trooper Gosnell had been acting with "reasonable diligen[ce]" throughout this event, and it simply took a long time for him to complete his traffic-related records checks and write up the warning – and that these steps were not delayed in any way by his discussions with Trooper Anderson – the Court could conclude that Ms. Beider's detention relating to the traffic stop had not been unnecessarily delayed and her motion could be denied. But, as noted in the prior two sections, the Government has not carried its burden of showing that Trooper Gosnell devoted his full time and attention to completing the components of the traffic stop. Rather, he devoted significant portions of time to investigating possible criminal activity without having sufficient reasonable suspicion to believe that it was occurring. In short, the traffic stop checking of records was prolonged in order to investigate whether there was probable cause to believe that Ms. Beider was transporting drugs.

Once Trooper Gosnell diverted his attention to pursuing a criminal investigation for which he lacked reasonable suspicion (be that moment the calling of Trooper Anderson or the calling of EPIC), Trooper Gosnell began to violate Ms. Beider's Fourth Amendment rights and the thereafter the information he obtained as a result of that diverted attention (most significantly, the license plate reader data) became tainted. At the same time, the canine search of Ms. Beider's vehicle by Trooper Anderson was the proximate cause of the physical search that discovered the drugs, and if Trooper Anderson's search of the vehicle could be independently justified under the Fourth Amendment, Trooper Gosnell's actions might be irrelevant. But it is clear from the record that Trooper Anderson's presence on the scene was a direct result of unlawful conduct by Trooper Gosnell in summoning him. Trooper Anderson did not simply stumble across the ongoing traffic stop and decide to assist, nor did he come to the scene to assist

Trooper Gosnell in resolving the traffic violation. Trooper Anderson's presence, and indeed, all of the suspicion that he developed from talking to Ms. Beider, depended upon information conveyed to him by Trooper Gosnell. Because that information from Trooper Gosnell was tainted by Trooper Gosnell's own Fourth Amendment violations, all of the information obtained by Trooper Anderson, including the canine search, is tainted as well.

Accordingly, the Court finds that the search of Ms. Beider's vehicle and the discovery of the drugs resulted from a violation of her Fourth Amendment rights, requiring suppression of that evidence.

## CONCLUSION

For the foregoing reasons, the Court **SUSTAINS** Ms. Beider's Objections **(# 79)** and **DECLINES TO ADOPT** the Recommendation **(# 69)**. The Court **GRANTS** Ms. Beider's Motion to Suppress **(# 22)** and the fruits of the search of Ms. Beider's vehicle on September 16, 2016 are **SUPPRESSED**.

Dated this 26th day of February, 2019.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge